UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

KIM LLOYD BIGGE                      CIVIL ACTION NO. 6:18-cv-01404

VERSUS                               JUDGE JUNEAU

COMMISSIONER OF THE                  MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision should be affirmed and this matter should be dismissed with prejudice.

## Administrative Proceedings

The claimant, Kim Lloyd Bigge, fully exhausted his administrative remedies before filing this action. He filed an application for disability insurance benefits ("DIB"), alleging disability beginning on October 15, 2015,[1] which was denied.[2] He then requested a hearing, which was held on October 27, 2017 before Administrative

---

[1]    Rec. Doc. 14-1 at 140.

[2]    Rec. Doc. 14-1 at 57.

Law Judge Paul Wood.[3]  The ALJ issued a decision on January 3, 2018, concluding that the claimant was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date of the decision.[4]  The claimant requested that the Appeals Council review the ALJ's decision, but the Appeal Council found no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[6]  The claimant then initiated this action, seeking judicial review of the Commissioner's decision.

### Summary of Pertinent Facts

The claimant was born on September 18, 1959.[7]  At the time of the ALJ's decision, he was 58 years old.  He did not complete high school or obtain a GED,[8] and he has relevant work experience as a security guard.[9]  He alleged that he has been disabled since October 15, 2015 due to neck and back injuries.[10]

---

[3]    A transcript of the hearing is found in the record at Rec. Doc. 14-1 at 30-54.

[4]    Rec. Doc. 14-1 at 19-25.

[5]    Rec. Doc. 14-1 at 5.

[6]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]    Rec. Doc. 14-1 at 34, 58.

[8]    Rec. Doc. 14-1 at 35-36, 176.

[9]    Rec. Doc. 14-1 at 38-40, 164, 183.

[10]    Rec. Doc. 14-1 at 48-49, 58, 175.

On May 21, 2015,[11] the claimant was seen by Dr. Keith R. Mack at the Metropolitan Health Group in Lafayette, Louisiana. He reported that he had been in a motor vehicle accident about a week earlier. He stated that he was wearing his seat belt and driving a car when he was rear-ended by a truck. His airbags did not deploy, he did not lose consciousness, and he did not seek immediate medical attention. He reported, however, that he had experienced low back pain since the accident. He also reported having injured his low back in 2002. In connection with the prior accident, he said he was treated with physical therapy and epidural steroid injections. The treatment note is inconsistent because it states that the claimant eventually underwent spinal decompression as a result of the earlier accident but it also states that he did not have surgery.[12] The claimant told Dr. Mack that he had been pain free for about two and a half years before the motor vehicle accident, had not missed any work since the accident, and was working full time as a security guard. Upon physical examination, the claimant had a full range of motion in his neck with some pain, soreness, stiffness, and tenderness to direct palpation in the right paraspinous musculature with palpable muscle spasms detected. He denied pain, numbness, or tingling radiating down his arms. His strength was 5/5 in both

---

[11]    Rec. Doc. 14-1 at 310-312.

[12]    Dr. Sledge's treatment notes also indicate that the claimant had spinal decompression surgery (see, e.g., Rec. Doc. 14-1 at 334) but the claimant denied back surgery in his hearing testimony (Rec. Doc. 14-1 at 43).

arms.  He had sixty degrees of flexion in his lumbar spine with pain, soreness, stiffness, and tenderness to direct palpation in the left paraspinous musculature that radiated toward the thoracolumbar region with palpable muscle spasms detected.  He denied pain, numbness, or tingling radiating into his legs.  Strength was 5/5 in both legs.  Dr. Mack's impressions were musculoligamentous strain of the cervical spine, thoracic spine, and lumbar spine with a history of herniated lumbar disks.  Dr. Mack prescribed Tylenol 3, Motrin, and Flexeril; ordered physical medicine treatments three times per week; and ordered x-rays.

The claimant returned to Dr. Mack on June 4, 2015.[13]  Only his neck was bothering him, and he denied being in pain.  He stated that the medication and physical medicine treatments were helping.  He had a normal range of motion in his neck and lumbar spine with some residual pain in the paraspinous musculature of the cervical spine and the lumbar spine.  The physical medicine treatments and medications were continued.

The claimant saw Dr. Mack again on June 17, 2015.[14]  He rated his neck and back pain at seven out of ten and stated that his pain was worsening although the medication and physical medicine treatments were helping.  He had stopped working.  Physical examination showed pain and soreness in the paraspinous and

---

[13]      Rec. Doc. 14-1 at 309.

[14]      Rec. Doc. 14-1 at 308.

trapezius muscle distributions specifically on the right side with pain in the lumbar spine. Medication and physical medicine treatments were continued.

On June 19, 2015, the claimant presented at the emergency room at Regional Medical Center of Acadiana in Lafayette, Louisiana, complaining of chest pain.[15] He described the pain as sharp, non-radiating substernal pain that lasted for about forty-five minutes. By the time he was examined, however, the pain had stopped. He also reported that he had been having right thoracic back pain that radiated up his neck and down his right arm for about a week and a half that started after a motor vehicle accident. He stated that he was taking Flexeril, Ibuprofen 800 mg., and Tylenol 3. He also reported a history of arthritis in his low back. Upon examination, he had a full range of motion in his neck. Diagnostic testing was performed, and his chest pain did not return while he was at the hospital. A chest x-ray showed that he had chronic obstructive pulmonary disease ("COPD"). He was diagnosed with atypical chest pain and discharged home.

An MRI of the claimant's cervical spine, obtained on June 27, 2015,[16] showed a small central disc protrusion/herniation at C3-4 without central canal stenosis and mild foraminal stenosis bilaterally; a small posterior bulge at C4-5 without spinal stenosis; a right paracentral to lateral disc protrusion/herniation and spondylosis at

---

[15]    Rec. Doc. 14-1 at 257-274, 280-295.

[16]    Rec. Doc. 14-1 a 318-319.

C5-6 without central canal stenosis and moderate right foraminal stenosis; and a posterior spondylytic disc bulge at C6-7 without central canal stenosis and mild to moderate right and mild left foraminal stenosis.  An MRI of the claimant's thoracic spine obtained the same day,[17] showed mild compression deformity involving the superior endplate of T4 without associated marrow edema that could be an old compression fracture or a developmental process; right paracentral disc protrusion/herniation at T9-10 without spinal stenosis; and left paracentral disc protrusion/herniation at T10-11 without spinal stenosis.  An MRI of the claimant's lumbar spine, also obtained on the same day,[18] showed mild levoscoliosis, multilevel facet hypertrophy, posterior disc bulge at L3-4 and L4-5 without central canal stenosis, mild foraminal stenosis bilaterally at L4-5; and posterior disc bulge at L5-S1 with central annular tear/fissure and facet hypertrophy without spinal stenosis.

The claimant returned to Dr. Mack on July 2, 2015.[19]  He reported that his neck and back were the same and rated his pain at four out of ten.  He had begun physical therapy on June 22, and he stated that physical therapy and medication were helping.  Dr. Mack reviewed the MRI results with the claimant.  Dr. Mack also renewed the Motrin and Flexeril prescriptions, continued physical therapy, and

---

[17]    Rec. Doc. 14-1 at 320.

[18]    Rec. Doc. 14-1 at 321-322.

[19]    Rec. Doc. 14-1 at 306-307.

referred the claimant to the orthopedic surgeon of the claimant's choice.  Dr. Mack noted that the claimant was working part-time.

The claimant again saw Dr. Mack on July 30, 2015.[20]  His condition was unchanged, and he reported that he was scheduled to see Dr. Sledge.  He was having trouble scheduling physical therapy due to his part-time job.  Physical therapy was therefore discontinued, and physical medicine treatments were again started.

The claimant saw Dr. John B. Sledge, III at the Lafayette Bone & Joint Clinic on August 5, 2015.[21]  The claimant reported the 2002 injury to his lumbar spine, stated that it had been treated conservatively, and had been manageable without medical attention or physical limitations over the last few years.  He complained of neck pain that he related to the motor vehicle accident of May 15, 2015 and described his symptoms as neck pain and stiffness, with pain radiating to the right trapezius, right chest, right shoulder, and right arm.  He described the pain as sharp, dull, aching, and throbbing, and he said that onset was sudden and immediate after the accident.  He described his symptoms as moderate in severity and unchanged.  The claimant also described upper back stiffness and pain at the level of four out of ten that he related to the motor vehicle accident.  His gait was normal, he had normal strength in all extremities, normal sensation, and normal reflexes.  Range of motion

---

[20]      Rec. Doc. 14-1 at 305.

[21]      Rec. Doc. 14-1 at 333-337.

testing of the cervical and thoracic spine was limited due to pain.  Muscle spasms were present.  X-rays were taken.  Dr. Sledge diagnosed neck pain, myofasciitis, cervical sprain/strain, cervical spondylitis, and thoracic sprain.

The claimant had physical therapy at Orthopedic & Sports Physical Therapy starting on August 19, 2015 and continuing through September 2015.[22]  According to physical therapist Craig T. Caldwell, the claimant reported a 90% improvement in his overall condition, including an increase in his cervical range of motion, and rated his pain at a low of zero and a high of four on a ten point scale.  He was discharged with a home exercise program on September 10, 2015.

The claimant returned to Dr. Mack on August 27, 2015.[23]  He reported an overall improvement in his condition and rated his neck and back pain at two out of ten.  Physical examination showed a normal range of motion in his cervical and thoracic spine but a restricted range of motion in his lumbar spine.  He reported improvement with medication and physical therapy.  It was noted that he was seeing Dr. Sledge and working part-time.

The claimant saw Dr. Sledge again on September 16, 2015.[24]  He reported significant improvement with physical therapy, activity modification, and Ibuprofen.

---

[22]     Rec. Doc. 14-1 at 298-301.

[23]     Rec. Doc. 14-1 at 304.

[24]     Rec. Doc. 14-1 at 338-340.

He reported no current pain.  He had no tenderness to palpation of his cervical or thoracic spine, normal posture and gait, normal coordination, and normal reflexes.

The claimant again saw Dr. Mack on October 8, 2015,[25] and reported that his neck, mid-back, and low back had returned to the way they were before the accident. He denied being in pain.  Physical examination revealed a fairly good range of motion in all areas but some residual soreness and stiffness in the lumbar area.  He requested to be discharged and Dr. Mack did so.

The claimant returned to Dr. Sledge on November 11, 2015.[26]  He reported that his neck pain was improved and that his low back pain increased with bending over.  He rated his pain at two on a ten-point scale.  His gait was normal, there was no pain or tenderness to palpation of his cervical or thoracic spine.  The plan was for the claimant to continue his home exercise program and see a chiropractor.

On April 13, 2016, the claimant again saw Dr. Sledge.[27]  He complained of intermittent neck pain radiating to his right shoulder as well as constant back pain with numbness and tingling radiating down the outside of his thigh.  He rated his pain at six out of ten.  Examination showed muscle spasms in his neck and restricted

---

[25]    Rec. Doc. 14-1 at 303.

[26]    Rec. Doc. 14-1 at 341-343.

[27]    Rec. Doc. 14-1 at 344-347.

9

range of motion due to pain.  Because physical therapy was helpful in the past, he wished to proceed with physical therapy again.

The claimant treated with the Barczyk Chiropractic Group from April through November 2016.[28]

On June 6, 2016, the claimant was again seen by Dr. Sledge.[29]  He reported that he had been doing a home exercise program and seeing chiropractor Dr. Barczyk.  He complained of neck and right arm pain as well as muscle spasms in his neck.  He had mild tenderness on palpation of his neck and a full range of motion with mild discomfort.  The diagnoses were muscle and tendon strain in the thorax, strain of joints and ligaments in the neck, cervical spondylosis, and cervicalgia.  The claimant reported that chiropractic care had improved his neck pain and he had no upper extremity radiculopathy.

The claimant returned to Dr. Sledge on August 15, 2016.[30]  He complained of neck pain on the left side that did not radiate.  He explained that the pain had worsened about three weeks earlier when he had to duck to avoid hitting a board. He rated his pain at four on a ten-point scale and stated that moving his head worsened his pain.  Examination showed moderate tenderness to the cervical facets

---

[28]    Rec. Doc. 14-1 at 324-326, 370-372.

[29]    Rec. Doc. 14-1 at 348-351.

[30]    Rec. Doc. 14-1 at 353-356.

and paraspinal musculature on palpation and painful cervical muscles with lateral rotation.  Examination of the lumbar spine showed loss of normal lumbar lordosis and painful muscles with flexion and extension, with pain radiating to the sacral region.  Treatment options were discussed, and the claimant opted to continue with activity modification, anti-inflammatories, and a combination of home exercises and chiropractic treatment.  The diagnoses assigned were cervical spinal instabilities, sprain of ligaments in the lumbar spine, spinal instabilities in the lumbrosacral region, and spondylolysis.

The claimant again saw Dr. Sledge on November 14, 2016.[31]  He continued to complain of aching neck pain, but he stated that it did not radiate.  He also described numbness in his right lateral thigh.  He reported that tilting his head exacerbated his neck pain.  He was continuing to see a chiropractor, which he stated alleviated his neck pain.  He rated his pain at three on a ten-point scale.  The claimant indicated a preference for continuing with activity modification, anti-inflammatories, and a combination of home exercises and chiropractic care.

The claimant returned to Dr. Sledge on December 19, 2016.[32]  He described his neck pain as stiffness that did not radiate and described his back pain as pinching that did not radiate.  He also stated that he had numbness down his right lateral thigh.

---

[31]      Rec. Doc. 14-1 at 357-360.

[32]      Rec. Doc. 14-1 at 361-364.

11

He rated his pain at two on a ten-point scale.  His cervical range of motion was restricted due to pain.  It was noted that, if his cervical symptoms persisted, he would be a candidate for facet joint injections or anterior cervical discectomy surgery; and, if his low back and leg symptoms worsened, he would be a candidate for facet joint injections or lumbar epidural steroid injections.

The claimant again saw Dr. Sledge on May 24, 2017.[33]  He complained of aching neck pain that did not radiate and dull, aching low back pain as well as numbness in his right lateral thigh.  He rated his neck pain at three and his back pain at seven on a ten-point scale.  However, he stated that his pain was unchanged since his last visit.  The claimant's cervical range of motion was restricted due to pain. Palpation of the neck revealed tenderness at the lower cervical facets and paraspinal musculature.  Palpation of the lumbar spine showed mild tenderness over the lower lumbar area, strength and tone were intact, and range of motion testing was restricted due to pain.   The diagnoses assigned were cervical spondylosis, cervical disc displacement, myalgia, lumbar spondylosis, lumbar radiculopathy, and intervertebral disc disorders with radiculopathy, thoracic region.  The treatment recommendations remained the same.

---

[33]    Rec. Doc. 14-1 at 365-367.

On June 5, 2017, the claimant again treated at the Barczyk Chiropractic Group.[34]

On October 27, 2017, the claimant testified at a hearing regarding his symptoms and his medical treatment.[35]  He explained that he injured his low back in 2002 in an accident while doing construction work.  When asked to describe the problems that allegedly prevented him from working, he identified pain in his low back.  He stated that he has nine damaged discs in his spine as well as scoliosis, a compression fracture, and arthritis.  He stated that Dr. Sledge recommended lumbar epidural steroid injections for his back but recommended against back surgery.  He confirmed that he had COPD but was not being treated for that condition.  He was no longer seeing Dr. Sledge and no longer seeing a chiropractor.  He stated that he had pain in his neck when washing his hair and shaving and had problems sleeping.  He formerly had anxiety and took Effexor for a short time but found that it did not help and stopped taking it.  He admitted to having had a drinking problem in the past but stated that he had been sober for twenty-seven years.  He was taking no prescription medications but was taking turmeric as an anti-inflammatory, Ibuprofen, and a lot of vitamins.  He stated that he feared taking narcotic painkillers, but was considering taking Gabapentin, a nerve blocker.  He explained that he had

---

[34]      Rec. Doc. 14-1 at 369.

[35]      Rec. Doc. 14-1 at 30-54.

recently tried using an inversion table but that resulted in a visit to the emergency room.[36]  The claimant estimated that he could stand for about twenty minutes, walk for about twenty minutes, and sit in an office chair for hours at a time.  He estimated that he could lift twenty pounds.  He denied having problems with concentration and stated that he gets along with most people.  In his opinion, his upper back and neck conditions had improved over the preceding two years, but his low back condition had gotten much worse.

The claimant stated that he had worked as a carpenter and in heavy construction for many years then transitioned to being a security guard after his back injury in 2002.  When laws changed in 2015, he was no longer permitted to carry a gun due to an earlier felony conviction and could no longer work as an armed security guard.  At the time of the hearing, the claimant was working two days a week as a cashier at a casino in Henderson, Louisiana.  He explained that his limited work schedule was "[p]artly because that's all I can tolerate and partly because that's what [his employer's] schedule will bear."

The claimant now seeks reversal of the Commissioner's adverse ruling.

---

[36]    There is no evidence of such an emergency room visit in the record.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[37]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[38]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[39]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[40]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[41]  Conflicts in

---

[37]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[38]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[39]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[40]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[41]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[42] and credibility assessments[43] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[44]

## B.    Entitlement to Benefits

The DIB program provides income to individuals who are forced into involuntary, premature retirement if they are both insured and disabled, regardless of indigence.[45]  A person is disabled if "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[46]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education,

---

[42]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[43]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[44]    *Wren v. Sullivan*, 925 F.2d at 126.

[45]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[46]    42 U.S.C. § 1382c(a)(3)(A).

and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[47]

## C.    <u>Evaluation Process and Burden of Proof</u>

A sequential five-step inquiry is used to determine disability.  This process requires the Commissioner to analyze whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[48]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[49] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[50]  The claimant's residual functional capacity is used at the fourth step to

---

[47]    42 U.S.C. § 1382c(a)(3)(B).

[48]    20 C.F.R. § 404.1520.

[49]    20 C.F.R. § 404.1520(a)(4).

[50]    20 C.F.R. § 404.1545(a)(1).

determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[51]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[52]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[53]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[54]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[55]

---

[51]    20 C.F.R. § 404.1520(e).

[52]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[53]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[54]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[55]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

**D.**    **The ALJ's Findings and Conclusions**

At step one, the ALJ determined that the claimant has not engaged in substantial gainful activity since October 15, 2015,[56] which is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  cervical, thoracic, and lumbar degenerative changes with multi-level herniation and bulges.[57]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work except that he "is limited to occasional climbing or ramps and stairs but no climbing of ladders, ropes, or scaffolds and occasional balancing, stooping, kneeling, crouching, and crawling."[58]   The claimant challenged this finding.

---

[56]    Rec. Doc. 14-1 at 22.

[57]    Rec. Doc. 14-1 at 22.

[58]    Rec. Doc. 14-1 at 22.

At step four, the ALJ found that the claimant is capable of performing his past relevant work as a security guard.[59]  The claimant challenged this finding.

At step five, the ALJ found that the claimant was not disabled from October 15, 2015 (the alleged disability onset date) through January 3, 2018 (the date of the decision) because there are jobs in the national economy that he can perform.[60]  The claimant challenged this finding.

**E.    The Allegations of Error**

The claimant contends that the ALJ erred (1) by failing to apply the Medical-Vocational Guidelines ("the Grids") to find the claimant disabled; and (2) by failing to give controlling weight to the opinions of the claimant's treating physician in evaluating the claimant's residual functional capacity and ability to perform his past relevant work.

**F.    Applicability of the Grids**

The claimant argued that the ALJ erred by failing to apply the Grids and further argued that, if the Grids were applied, the combination of his age, education, work experience, and residual functional capacity would mandate a finding that he is disabled.  But the Grids apply only when the claimant is incapable of performing

---

[59]    Rec. Doc. 14-1 at 24.

[60]    Rec. Doc. 14-1 at 25.

his past relevant work.[61] In this case, the ALJ found that the claimant was capable of performing his past relevant work.  While the claimant disagrees with that finding, that is a wholly separate issue.  And, as will be discussed below, there is substantial evidence in the record to support the ALJ's conclusion that the claimant is capable of performing his past relevant work.  Because the ALJ found that the claimant was capable of performing his past relevant work, it was not appropriate for the ALJ to apply the Grids.  The Grids are to be applied only when it is found that the claimant is incapable of performing any past relevant work.  In this case, the ALJ found that the claimant could perform his past relevant work; therefore, the ALJ did not err in failing to apply the Grids.

## G.    The Weight to be Afforded Dr. Sledge's Opinions

The claimant argued that he is unable to work due to back and neck pain.  Pain can constitute a disabling impairment,[62] but pain is disabling only when it is constant,

---

[61]    20 C.F.R. § 404.1569, Pt. 404, App'x, 200.00(a) ("The following rules reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work.").  See, also, *Wren v. Sullivan*, 925 F.2d at 129 ("the Medical-Vocational Guidelines apply only when the ALJ reaches step five and finds that the claimant is unable to perform claimant's past relevant work."); *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989)

[62]    *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).

21

unremitting, and wholly unresponsive to therapeutic treatment.[63]  Mild or moderate pain is not disabling.  Furthermore, subjective complaints, such as complaints of pain, must be corroborated by objective medical evidence.[64]  While an ALJ must take into account a claimant's subjective allegations of pain in determining residual functional capacity, the claimant must produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged.[65] The mere existence of pain does not automatically create grounds for disability.[66]

In this case, the claimant established that he has significant problems with the discs in the cervical, thoracic, and lumbar areas of his spine that can and do cause pain, but he did not establish that those problems cause intractable, disabling pain. At most visits with his physicians, he rated his pain at less than five on a ten-point scale, suggesting that it was mild to moderate in nature.  He was never prescribed narcotic painkillers and at the time of the hearing was taking no prescription medications at all, managing his pain with over-the-counter analgesics.  Dr. Sledge offered to treat his complaints with epidural steroid injections, but the claimant declined that treatment.  He also reported to his doctors on several occasions that his

---

[63]     *Falco v. Shalala*, 27 F.3d at 163; *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990).

[64]     *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

[65]     *Harper v. Sullivan*, 887 F.2d at 96.

[66]     *Harper v. Sullivan*, 887 F.2d at 96.

pain was improved with anti-inflammatory medications, mild medications such as Ibuprofen, physical therapy, and chiropractic care.    A condition that can be controlled or remedied by medication or therapy cannot serve as a basis for a finding of disability.[67]    Therefore, the evidence in the record does not establish that the claimant's pain was disabling.  Accordingly, the substantive evidence in the record supports the ALJ's finding that the claimant is not disabled.

The ALJ gave great weight to the opinions of Dr. David L. Hicks, who opined that the claimant could return to his work as a security guard and consequently was not disabled.  The claimant argued that greater weight should have been given to Dr. Sledge's opinions because he was the claimant's treating physician.  But the record does not contain a functional analysis by Dr. Sledge or any opinions by Dr. Sledge regarding how much the claimant was capable of lifting, walking, standing, or sitting.  Dr. Sledge did not place any functional limitations on the claimant. Although the claimant argued in his briefing that Dr. Sledge recommended surgical intervention, the claimant testified at the hearing that Dr. Sledge counseled against surgery.  The claimant argued that there were no jobs available to him because he would require unscheduled breaks during the work day due to his back and neck pain.  But Dr. Sledge did not offer an opinion that the claimant would require

---

[67]    *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

unscheduled breaks or any modifications in typical workplace requirements. Therefore, there is no medical opinion supporting the hypothetical question posed at the hearing but rejected by the ALJ in formulating his decision regarding the need for downtime during the work day.

In sum, the record contains no opinions from Dr. Sledge that refute or cast doubt on the functional analysis performed by Dr. Hicks.  Accordingly, the ALJ did not err in giving great weight to Dr. Hicks's opinions.

## Conclusion and Recommendation

For the foregoing reasons,

IT IS THE RECOMMENDATION of this Court that the decision of the Commissioner be AFFIRMED and this matter be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by

24

Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual

findings or the legal conclusions accepted by the district court, except upon grounds

of plain error.[68]

Signed in Lafayette, Louisiana, this 7th day of August 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[68]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).